UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
     In re:                                               Chapter 13
                                                       Case No. 11-78841-reg

     GINO RUFFINI and LISA RUFFINI,

                     Debtors.
----------------------------------------------------------------x
     The Bankruptcy Estate of
     GINO RUFFINI and LISA RUFFINI,
                     Plaintiff,

                                             Adv. Proc. No. 12-8396-reg

   against

     NORTON LAW GROUP PLLC,
     LAW OFFICES OF KYLE NORTON, P.C.,
     and KYLE NORTON, ESQ.,
                     Defendants.
----------------------------------------------------------------x

## DECISION AFTER TRIAL

     This matter is before the Court pursuant to an adversary proceeding commenced by the bankruptcy estate ("Estate" or "Plaintiff") of the Chapter 13 Debtors, Gino and Lisa Ruffini ("Debtors"), against Norton Law Group PLLC, Law Offices of Kyle Norton, P.C., and Kyle Norton, Esq. ("Defendants").   The Plaintiff seeks to recover, for the benefit of the estate, $46,090.67 in pre-petition legal fees paid by the Debtors to the Defendants in connection with mortgage modification and foreclosure proceedings, pursuant to preference and constructive fraudulent conveyance theories.  *See* 11 U.S.C. §§ 105, 544, 547, 548 and 550; N.Y. Debt. & Cred. Law ("DCL") §§ 271-273.  The Plaintiff asserts that the substantial sum of money paid to the Defendants for legal services far exceeds the reasonable value of the legal services provided. As there is some uncertainty as to the precise amounts paid to the Defendants, the Plaintiff also requests an accounting of any and all moneys paid, directly or indirectly, to the Defendants.  The

Defendants argue that they did, in fact, provide legal services pursuant to retainer agreements signed by the Debtors, but due to the Debtors' own misconduct and failure to mitigate damages, they were unable to secure a permanent mortgage modification with the Debtors' mortgagee, Wells Fargo Bank, N.A. ("Wells Fargo").

This case presents the Court with the task of determining to what extent fees paid pre-petition by a debtor/client to a law firm are vulnerable to recovery as fraudulent conveyances and/or preferences.  The Court is mindful of the unique nature of the attorney and client relationship and is sensitive to issuing a decision involving an analysis of whether an attorney's services to a client were of reasonable value when measured against the fees paid.  However, the quality of professional services is within the scope of a fraudulent conveyance action.  *See Murray v. Prescott, Ball & Turben, Inc. (In re Chi., Mo. & W. Ry. Co.)*, 124 B.R. 769, 773 (Bankr. N.D.Ill. 1991) ("[T]o hold that professional services are beyond the scope of the fraudulent conveyance laws…clearly defeats the purpose of the statute which is to conserve the debtor's estate for the benefit of creditors"); *see also BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt, Inc.)*, 320 B.R. 265, 280 (Bankr. D.Del. 2005) ("The quality of professional services is within the scope of a fraudulent conveyance action").  As will be demonstrated, the results in this case are more a product of the particular facts than any attempt to articulate a standard as to how attorneys should be compensated for representing their clients.[1]

There were two retainer agreements introduced into evidence at trial.  The record establishes that the first retainer agreement provided for a flat fee of $3,300 which established

---

[1] This Court is sensitive to the difficulty inherent in analyzing the quality of advice given by a professional.  However, in certain cases, such as the one before the Court, a lawyer's conduct may be so egregious as to warrant a finding that virtually no services of value were provided to a client.  This case is not meant to set any bright line tests or standards for determining what constitutes fair consideration in future cases involving services provided by professionals.

the agreed upon value of the particular services for mortgage modification and loss mitigation. There is nothing in the record to rebut this finding or to support a finding that additional work was performed beyond the parameters set forth in the first retainer agreement. Yet the Defendants billed the Debtors for hourly fees significantly in excess of $3,300. The Court finds that amounts billed and paid in excess of $3,300 are recoverable as fraudulent conveyances. Any amounts paid in excess of $3,300 did not constitute "reasonably equivalent value" or "fair consideration" for the legal services of the Defendants. This amount includes all payments made to the Defendants for hourly billing between December 8, 2009 and July 16, 2010, and any hourly charges thereafter related to the mortgage modification.

The second retainer agreement related to defense of a foreclosure proceeding. That agreement provided that the Debtors would be billed on an hourly basis, with a minimum fee of $5,000. However, the Debtor testified that neither he nor his wife understood this second agreement and their obligation to pay the Defendants fees on an hourly basis, including $400 per hour for senior attorneys. The Debtor also testified that no one from the Defendants' law firm explained the Debtors' obligations under the second retainer agreement. The Defendants did not refute this testimony at trial. Based on the record and the Court's assessment of the credibility of the Debtor's testimony, the Court finds that the Defendants did not proceed in good faith or in compliance with their responsibilities under New York's Code of Professional Conduct in connection with their representation of the Debtors in the foreclosure action. As such, the Court finds that the second retainer agreement is unenforceable under applicable state law and cannot be used by the Defendants to support any prima facie defense that the payments made by the Debtors were made pursuant to a valid and enforceable retainer agreement. Alternatively, even if the second retainer agreement is valid and enforceable, the Court finds that the Defendants

breached the agreement when they failed to provide even the most fundamental services to the Debtors such as keeping them informed of the status of their case: conduct which violates the ethical rules applicable to counsel who practice in New York State.  For that reason, the Court finds that the services provided by the Defendants do not represent reasonably equivalent value, or fair consideration, in exchange for the hourly billing paid by the Debtors.  Rather, the Court finds that the services rendered were so deficient that they did not provide any value to the Debtors and as such all payments made by the Debtors to the Defendants in connection with the second retainer agreement are recoverable by the Plaintiff.  However, the Court will not make a determination of the exact amount of fees to be returned to the Debtors until a thorough accounting is submitted for the Court's review.

Finally, the Court finds that the Plaintiff's preference claims are moot, as the Defendants will have to disgorge all but $3,300 of the fees paid to the Defendants pursuant to the Plaintiff's fraudulent conveyance claims.

## PROCEDURAL HISTORY

On December 19, 2011, the Debtors filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.  This Court confirmed the Debtors' Chapter 13 plan on September 27, 2012.  On September 25, 2012, this Court granted the application to employ Zinker & Herzberg LLP as special counsel to prosecute the current action against the Defendants on behalf of the Debtors' bankruptcy estate.  On October 19, 2012, Mr. Herzberg commenced this adversary proceeding on behalf of the Estate to recover $46,060.67 that the Debtors allegedly paid to the Defendants, prepetition, for legal services.  The Plaintiff alleges five separate causes of action including: (1) fraudulent conveyance under DCL §§ 271-273, (2) fraudulent conveyance under

4

11 U.S.C. § 548(a)(1)(B), and (3) preference under 11 U.S.C. § 547(b).  The Plaintiff also requests an accounting of any and all moneys paid, directly or indirectly, to the Defendants by the Debtors.

On December 4, 2012, the Plaintiff filed a motion for default judgment due to the Defendants' failure to file a timely answer the Complaint in accordance with Bankruptcy Rule 7012, and their failure to appear at the pretrial conference on November 26, 2012.  The Court granted the default motion on January 15, 2013 but because the Defendants had counsel who appeared for them at the hearing, the Court held the proposed Order in abeyance and allowed the Defendants to file an answer by January 17, 2013.  On January 17, 2013, the Defendants filed an answer asserting general denials, as well as equitable defenses based on the Debtors' alleged culpable conduct and failure to mitigate damages.

The Plaintiff filed a motion for summary judgment on January 29, 2013, arguing that the undisputed material facts of the case show that the Debtors did not receive reasonably equivalent value in exchange for their alleged payment of $46,090.67 to the Defendants for pre-petition legal services.  The Plaintiff asserted that the hourly charges by the Defendants were exorbitant and the legal services provided did not represent fair consideration for the payments made.  At a hearing on the motion for summary judgment held on February 25, 2013, the Court reserved decision on the motion for summary judgment, and scheduled a trial to commence on April 2, 2013.  The Defendants filed opposition to the motion for summary judgment on March 15, 2013, asserting that they did in fact secure mortgage modifications for the Debtors, but that those modifications fell through due to the Debtors' inaction.  The Defendants also disagree with the Plaintiff on the total amount of money paid to the Defendants by the Debtors, stating that the payments only add up to a total of $26,185.  The Plaintiffs filed a reply on March 21, 2013,

stating that the Court should strike the affidavit of Kyle Norton, Esq. attached to the opposition, which explained that the invoices and statements from the Norton Law Group accurately reflect the time entered by the attorneys on the Debtors' case. The Plaintiff argues that the statements in the affidavit are conclusory in nature and there is no underlying documentation to support those statements.

On March 29, 2013, the Plaintiff and the Defendants filed a Joint Pretrial Memorandum, and the Court commenced a trial on April 2, 2013. The only witness at trial was one of the Debtors, Gino Ruffini. Pursuant to the Joint Pre-Trial Memorandum, the Plaintiff's Exhibits 1-12 were admitted into evidence. Plaintiff's Exhibit 13, Bank Checks from Bank of America for Mortgage Payments, was admitted at trial without objection. Trial Transcript ("Trial Tr."), p. 13. In the Joint Pre-Trial Memorandum, the Defendants proposed to introduce fourteen exhibits at trial. The Plaintiff objected to all of these but one, which were documents already submitted by the Plaintiff as exhibits to its motion for summary judgment. The Plaintiff's objection was based on the fact that the Plaintiff had never seen copies of the documents and thus could not comment upon their admissibility. At trial, the Defendant's exhibit book included a total of nine exhibits, A through I, including exhibits that were previously objected to by the Plaintiff. Although the Defendants' Exhibits A – I were never formally admitted, the Plaintiff used and specifically relied on Exhibits A and B, the retainer agreements between the parties, at trial. Trial Tr., p 41-42. Therefore, those exhibits will be considered admitted into evidence for purposes of this Decision. *See Ohler v. United States*, 529 U.S. 753, 755 (2000) (citation omitted) ("If a party who has objected to evidence of a certain fact himself produces evidence from his own witness of the same fact, he has waived his objection").

The trial was scheduled to continue on May 2, 2013.  However, the parties did not appear on that date, and the trial was marked submitted at that time.

## FACTS

Towards the end of 2009, the Debtors' home began to enter foreclosure status.  Trial Tr., p. 5.  Gino Ruffini, a New York City bus operator, and his wife Lisa Ruffini, a medical transcriptionist, retained the Defendant, Norton Law Group PLLC ("Norton Law Group"), on June 12, 2009 in order to assist in obtaining a loan modification with their mortgagee, Wells Fargo.  Trial Tr., p. 6; Defendants' Ex. A.  The Debtors had two mortgages on their home with Wells Fargo: the first had a principal balance of $376,000 and the second had a principal balance of $74,588.28.  Trial Tr., p. 14-19.  While the Debtors were in default on both mortgages, they were only trying to get a modification of the first.  Trial Tr., p. 17, 19.

The Debtors signed a retainer on June 12, 2009, retaining the Defendant, Norton Law Group to represent the Debtors in a loss mitigation and loan modification with Wells Fargo ("First Retainer Agreement").  Defendants' Ex. B.  The description of services reads as follows:

> a. Initial Consultation and advising client regarding various loss mitigation options.
> b. Document review for various RESPA, Truth in Lending and predatory lending violations, while file structuring.
> c. Secure Bank-Authorization to speak on clients behalf.
> d. Communicating with bank regarding individual client's financials and faxing appropriate document to the appropriate department.
> e. Negotiating with Loss Mitigation and or Bank appointed Negotiator regarding client's file and achieve one of the Loss Mitigation services or resolutions (i.e. Loan Modification, Short Sale negotiation, Short Refinance negotiation, Deed in Lieu of Foreclosure, or Cash for Keys negotiations: (1) change of interest rate; (2) change of length of (term) of loan; (3) a forbearance agreement executed by the lender; (4) any waiver of late charges or penalties; or (5) a conversion of an adjustable interest rate into a fixed interest rate).

Defendants' Ex. B.

In the First Retainer Agreement the Debtors agreed to pay the Norton Law Group a flat fee of 1% of the current aggregate balance of the mortgage to be modified.  *Id.*  The agreement also stated that the hourly billing rate for Kyle Norton Esq. was $500 per hour, subject to increases "from time to time."  *Id.*  Although the First Retainer Agreement refers to "legal fees incurred with respect to the Additional Services…," the agreement does not define any "Additional Services," and the Debtors did not agree to pay for additional legal services on an hourly basis.  *Id.*  The only agreement is to pay a flat fee for the loan modification services. Although one percent of the first mortgage would, in this Court's calculation, result in a fee of approximately $3,700, according to the rider attached to the First Retainer Agreement, the Norton Law Group charged the Debtors $3,300, which was agreed to by both parties.  *Id.*  The Debtors paid $1,500 upon signing of the retainer agreement and then made eight payments of $225 between June 19, 2009 and August 7, 2009 in order to complete the $3,300 payment. Defendants' Ex. B.

Over the next year, the Defendants claim to have represented the Debtors in an attempt to obtain a mortgage modification.  The record reflects that the Defendants began billing the Debtors on an hourly basis for mortgage modification services commencing in December of 2009.  According to the Debtor, the Defendants demanded payment for fees every two weeks for $1,000 or more.  Trial Tr., p. 7.  The Debtor testified that the Defendants would call every two weeks for payment and threatened to terminate their case and let the sheriff foreclose on their home if they did not pay.  Trial Tr., p. 7, 39, 66.  When the law firm called them, the Debtors mainly spoke to Kimberly Ball, a secretary at the law firm.  Trial Tr., p. 11.  The Debtors only spoke to Mr. Norton once, when they first retained him.  Trial Tr., p. 11.  Even when they tried

to call or set up meetings with him at his office, rearranging their work schedules to do so, they were constantly told that Mr. Norton was out of the office or unavailable.  Trial Tr., p. 11, 12, 24, 28.

The Debtor testified that when they questioned the Defendants about what they were doing on the case, or asked for an explanation of their invoices, the Defendants answered, "this is office stuff" or "it's part of your litigation."  Trial Tr., p. 36.  When the Debtors asked about a discrepancy in numbers on one of their statements from the Defendants, the Defendants response was, "it's for your case, and we're working on it."  Trial Tr., p. 38.  The Debtors tried to call or go to the office to find out what was happening with their modification, but they were never able to talk to an attorney.  Trial Tr., p. 28.

Towards the end of 2009, Wells Fargo agreed to a temporary loan modification of the first mortgage that lasted six to seven months.  Trial Tr., p. 12.  This modification brought the Debtors' monthly mortgage payments down from $2,600 to $1,600.  Trial Tr., p. 12-13.  However, after the seventh month, the payment spiked back up to $2,600 with no explanation.  Trial Tr., p. 13.  According to the Debtor, when they asked the Norton Law Group what happened, the Defendants stated, "we're working on it." Trial Tr., p. 13.  The Debtors continued to call the Defendants' offices every week but never received a clear answer as to why the temporary modification ended. Trial Tr., p. 13.

It appears that the Defendants also may have given the Debtors questionable legal advice.  First, Mr. Norton allegedly advised the Debtors to take money out of all their bank accounts so that the funds would be out of the reach of creditors.  Trial Tr., p. 21.  The Defendants also allegedly advised the Debtors that while they were making their biweekly payments to the Defendants, they should cease making their mortgage payments, which included their real estate

taxes. Trial Tr., p. 26. The Debtors followed this advice for eighteen months. Trial Tr., p. 26-27. When asked at trial why he did not make these mortgage payments, the Debtor stated that he put his faith in his lawyer and thought he was doing the right thing. Trial Tr., p. 27.

Wells Fargo served the Debtors with a summons and complaint to commence a mortgage foreclosure action in the beginning of 2010. Trial Tr., p. 40-41. When the Debtors brought this to the Norton Law Group, they agreed to represent them in their foreclosure defense. With respect to fees, the Debtors were told to "just keep paying." Trial Tr., p. 41. On July 16, 2010, the Debtors signed a foreclosure defense retainer agreement with Defendant, Law Offices of Kyle Norton, P.C. ("Second Retainer Agreement"). Trial Tr., p. 47. The Debtor testified that neither he nor his wife understood why they were signing this agreement. Trial Tr., p. 47. The agreement required a "retainer" of $5,000, which was deemed to be a minimum fee for services, and provided that the retainer would be refreshed in increments of $2,500. Defendants' Ex. A. The Second Retainer Agreement laid out specific fees for each level of employee that would work on the Debtors' case: $400 per hour for senior attorneys, $300 per hour for associate attorneys, and $200 per hour for underwriter, paralegal, or processor. Defendants' Ex. A.[2] The Debtors did not make a lump sum payment of $5,000 to the law firm, nor did they agree to a payment schedule as was the case with the First Retainer Agreement, but they kept making their biweekly payments. Trial Tr., p. 68. The agreement also states, "Client has not been told by Law Offices of Kyle Norton, P.C. or any of its employees to stop paying their mortgage or any other bills." Defendants' Ex. A. However, the Debtor testified at trial that even though he initialed this statement, it was in direct contrast to what he was told in the office. Trial Tr., p. 48-49.

---

[2] There is one time charge of $3,000 per hour ($300 charge for .10 hour billed). Plaintiff's Ex. 3. Although that appears to have been a typographical error on the Defendants' part, it was, in fact, billed.

The record reflects that the Defendants appeared in court once on behalf of the Debtors for a foreclosure settlement conference, on February 9, 2011. *Id.* However, the Defendants did not tell the Debtors about this hearing until it had passed, nor were the Debtors aware that the Law Offices of Kyle Norton ever appeared in court on the foreclosure. Trial Tr., p. 21-23. The Debtors were not told that a state court directed them to produce documents towards a settlement, nor were they kept apprised of the status of the foreclosure proceedings. Trial Tr., p. 25.

Eventually, the Debtors hired a new attorney, Fred Grafstein, who filed their current Chapter 13 bankruptcy petition on December 19, 2011. Trial Tr., p. 28-29. The Debtor testified that the Defendants continued to pursue collection of past due invoices even after the Chapter 13 case was filed. Trial Tr., p. 53.

## DISCUSSION

1.      *1st and 2nd Causes of Action – Constructive Fraudulent Conveyance*

The Plaintiff seeks to recover $46,090.67 from the Defendants as constructive fraudulent conveyances under both federal and state statutes. *See* 11 U.S.C. § 548(a)(1)(B); N.Y. Debt. & Cred. §§ 271-273. The Plaintiff argues that the Debtors did not receive "reasonably equivalent value" or "fair consideration" in exchange for payments made to the Defendants while the Debtors were insolvent. Additionally, the Plaintiff argues that the Defendants lacked good faith in accepting the subject payments from the Debtors. *See* N.Y. Debt. & Cred. § 272.

a.      *Reasonably Equivalent Value and Fair Consideration*

Section 548(a)(1)(B) provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

The purpose of § 548 is to set aside transactions that "unfairly or improperly deplete a debtor's assets." *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010). Therefore, any transfer made by a financially impaired debtor within two years prior to the filing of a bankruptcy petition, for less than equivalent value, is vulnerable to avoidance. *See id.* at 876. The burden is on the movant to demonstrate the elements of a constructive fraudulent transfer claim by a preponderance of the evidence. *Id.* at 875 (citation omitted).

Similarly, under § 544, the trustee may use state fraudulent transfer laws to recover transfers made without fair consideration. *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 105 (Bankr. S.D.N.Y. 2002). Section 544(b) states:

12

> (b) [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).   Under New York constructive fraudulent conveyance laws, a person challenging the transfer of a debtor's property as constructively fraudulent must show that it was made without fair consideration under DCL § 272 and that the debtor was insolvent or was rendered insolvent by the transfer under DCL § 273.   *Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005); *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 309 (Bankr. E.D.N.Y. 2010).   The reach-back period for fraudulent transfers under New York law is six years.   *Mendelsohn v. Nat'l Westminster Bank, U.S.A. (In re Frank Santora Equip. Corp.)*, 256 B.R. 354, 372 (Bankr. E.D.N.Y. 2000) (citations omitted).

The term "value" is defined in the Bankruptcy Code as "property, or satisfaction or securing of a present or antecedent debt of the debtor…." 11 U.S.C. § 548(d)(2)(A).   While the Bankruptcy Code does not define "reasonably equivalent value," this term has substantially the same meaning as the interpretation of "fair consideration" under the DCL, which can be shown by a "fair equivalent" value for the property received.   *See* N.Y. Debt. & Cred. § 272; *Garcia v. Garcia (In re Garcia)*, 494 B.R. 799, 808 (Bankr. E.D.N.Y. 2013).   Under the DCL, fair consideration also requires good faith on the part of the transferee.   *See* N.Y. Debt. & Cred. § 272; *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 660 (Bankr. E.D.N.Y. 2008).   This requirement may be satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent schemes.   *Singh*, 434 B.R. at 309.   Aside from the good faith element incorporated into New York law, courts use the term "reasonably equivalent value" interchangeably with the DCL's "fair consideration" for purposes of analyzing constructive fraud claims under both statutes.   *Id.*

To determine whether a debtor received reasonably equivalent value, a court must compare what was given with what was received. *Pergament v. Reisner (In re Reisner)*, 357 B.R. 206, 211 (Bankr. E.D.N.Y. 2006) (citation omitted). The court must determine whether reasonably equivalent value was exchanged based on the facts and circumstances of each case. *Id.* (citing *Davis v. Suderov (In re Davis)*, 148 B.R. 165, 175 (Bankr. E.D.N.Y. 1992)). In undertaking this analysis, courts consider the good faith of the parties, whether it was an arm's length transaction, and what the debtor actually received. *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 844 (Bankr. S.D. Fla. 2012) (citation omitted). Courts must look to each transaction between the debtor and the transferee separately to see whether reasonably equivalent value was received in that transaction. *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 679 (Bankr. S.D.N.Y. 2000).

**b.**     *Insolvency*

In order for a party to recover under a constructive fraud theory, the moving party must also show that the debtor was insolvent at the time of the transfer. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I); N.Y. Debt. & Cred. § 273. The Bankruptcy Code defines insolvency for an individual as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, as a fair valuation…" 11 U.S.C. § 101(32)(A); *Jacobs*, 394 B.R. at 672. Similarly, under the DCL, "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. § 271. This is the "balance sheet test." In other words, the debtor's liabilities exceed assets at the time of transfer. *Durso*

*Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.)*, 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996).

Under New York law, there is a presumption of insolvency where a debtor makes a transfer without fair consideration.  The burden of persuasion then shifts to the transferee to show the transferor's solvency at the time of the transfer.  *Tese-Milner v. Edidin and Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013) (citing cases); *see also Jacobs*, 394 B.R. at 672 (citing *Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 83 (Bankr. E.D.N.Y. 2007)).

**c.**     *Recovery of Avoided Transfers*

Section 550(a)(1) provides:

> (a)Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544,…, 547, 548…of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made….

11 U.S.C. § 550(a)(1).  This section is intended to "restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."  *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,446 B.R. 32, 65 (Bankr. E.D.N.Y. 2011) (quoting *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)).  Damages are not allowed under this section, regardless of their availability under state law.  *Id.* (quoting *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010)).

**d.**     *The First Retainer Agreement*

15

The First Retainer Agreement states that the Norton Law Group would represent the Debtors in connection with a loan modification and loss mitigation process. Defendants' Ex. B. The agreement provided for a non-refundable flat fee of one percent of the current aggregate balance of the mortgage being modified. Although the agreement does mention hourly billing the Debtors did not agree to pay hourly fees beyond the flat fee of $3,300. As such, this Court finds that the Defendants did not provide reasonably equivalent value or fair consideration for any payments based on hourly billing, as the Defendants fixed the value of their services at $3,300. Therefore, any payments made in excess of this amount were not made in exchange for reasonably equivalent value. All hourly billing between December 8, 2009 and July 16, 2010, when the Debtors signed the Second Retainer Agreement in connection with foreclosure proceedings, was beyond the agreed value of the services to be rendered in connection with the First Retainer Agreement.

Because the Debtors' payments to the Defendants in connection with the First Retainer Agreement, beyond the agreed $3,300 flat fee, were made without fair consideration the presumption of insolvency applies under New York law. This shifts the burden of persuasion to the Defendants to show that the Debtors were in fact solvent while making the subject payments. The Court finds that the Defendants failed to prove the Debtors' solvency at the time of the transfers. In fact, the Defendants failed to introduce any evidence at trial related to the Debtors' solvency at the time of the transfers. Therefore, the presumption of insolvency remains unrebutted and the Plaintiff has carried its burden of proving insolvency under DCL § 273.

Since the Debtors made the subject payments to the Defendants without receiving reasonably equivalent value or fair consideration, and they were insolvent at the time of transfer, the Plaintiff may recover all payments based on hourly billing in excess of the $3,300 flat fee

agreed to by the parties.[3]  The Plaintiff may not recover the initial fee of $3,300, as this was a valid flat fee arrangement agreed to by the parties.  As the parties still disagree on the exact amount of payments made by the Debtors to the Defendants, an accounting will be necessary to determine the exact amount to be recovered by the Estate.

e.        *The Second Retainer Agreement*

The Court must also determine whether the Debtors received reasonably equivalent value or fair consideration in exchange for the payments made to the Defendants in connection with the Second Retainer Agreement.  Although generally payments made pursuant to a valid and enforceable contract are conclusively made for reasonably equivalent value, *see Wagner v. Oliva (In re Vaughan Co., Realtors)*, 500 B.R.778, 793 (Bankr. D.N.M. 2013) (citing *In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1286, 1289-90 (10th Cir. 1996)), where a contract is illegal or unenforceable, it does not support "reasonably equivalent value" for purposes of § 548.  *See Capitol Invs., Inc.*, 473 B.R. at 846.

The Court finds that the Second Retainer Agreement is not enforceable under state law. Therefore, the payments made pursuant to the agreement are not entitled to the presumption of reasonableness that normally applies where the parties' relations is governed by contract.  The implied covenant of good faith and fair dealing in a contract between parties is deeply embedded in New York case law and the New York Uniform Commercial Code.  *See* U.C.C. § 1-304; *Petitioning Creditors of Minpeco USA, Inc. v. Swiss Bank Corp. (In re Minpeco, USA, Inc.)*, 237 B.R. 12, 25-26 (Bankr. S.D.N.Y. 1997) (citation omitted).  Moreover, a binding contract or term in a contract requires a meeting of the minds as to its essential terms.  *Cairns & Assocs., Inc. v.*

---

[3] Although § 548 imposes a two-year reach-back period for avoidance actions under federal law, the DCL reach-back period is six years.  *Frank Santora Equip. Corp.*, 256 B.R. at 372.  Therefore, under state law the reach-back period in this case began in December 2005.

17

*Conopco, Inc. (In re Cairns & Assocs., Inc.)*, 372 B.R. 637, 652 (Bankr. S.D.N.Y. 2007)

(quoting *May v. Wilcox*, 182 A.D.2d 939, 940 (N.Y. App. Div. 1992)).

The New York Rules of Professional Conduct ("NYRPC") indirectly address this issue in the context of attorney client relations. Rule 1.5 provides:

> (b) A lawyer shall communicate to a client the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible. This information shall be communicated to the client before or within a reasonable time after commencement of the representation and shall be in writing where required by statute or court rule…Any changes in the scope of the representation or the basis or rate of the fee or expenses shall also be communicated to the client.

N.Y. Rules of Prof. Conduct § 1.5(b) (McKinney's 2013).

The Debtor testified that neither he nor his wife understood why they were signing another retainer agreement, Trial Tr., p. 47, and that no one from the Defendant law firm explained to him the significance of the retainer agreement or the financial obligations it imposed. The Defendants did not refute this testimony. *Id.* Additionally, the Court finds that the Defendants violated NYRPC Rule 1.5(b) by not explaining to the Debtors that they would need to pay another minimum fee of $5,000 plus hourly billing for defense of the foreclosure proceeding. An attorney is required to explain to a client the fees being charged, and here the Defendants did not. Based on the Debtor's testimony, which the Court finds credible and unrefuted, the Court cannot find that there was a meeting of the minds in connection with the Second Retainer Agreement, nor did the Defendant, Law Office of Kyle Norton, P.C., act in good faith in connection with the agreement, and as such it is unenforceable.

Even if this Court did not find the Second Retainer Agreement to be unenforceable, the Court would still find in favor of the Plaintiff. The record clearly demonstrates that the Defendants failed to perform even the most fundamental legal services required under the retainer agreement, and therefore failed to give the Debtors reasonably equivalent value in

exchange for the fees paid. *See Schmidt v. Persels & Assocs., LLC (In re Kinderknecht)*, 470 B.R. 149, 171 (Bankr. D.Kan. 2012) ("Courts draw upon and apply their own knowledge, professional experience and expertise in determining the value of services provided by defendants and the reasonableness of the fees").

According to the NYRPC:

> (a) A lawyer shall act with reasonable diligence and promptness in representing a client.
> (b) A lawyer shall not neglect a legal matter entrusted to the lawyer.
> (c) A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services….

N.Y. Rules of Prof. Conduct § 1.3 (McKinney's 2013).  Additionally, Rule 1.4 states:

> (a) A lawyer shall:
> > (1) promptly inform the client of:
> > > (i) any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(j), is required by these Rules;
> > > (ii) any information required by court rule or other law to be communicated to a client; and
> > > (iii) material developments in the matter including settlement or plea offers.
> > (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
> > (3) keep the client reasonably informed about the status of the matter;
> > (4) promptly comply with a client's reasonably requests for information; and
> > (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by these Rules or other law.
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

N.Y. Rules of Prof. Conduct § 1.3 (McKinney's 2013).  These rules constitute the standard of conduct applicable to attorneys who practice in New York.

According to the Debtor's testimony, which, again, the Court finds to be both credible and unrefuted, the Defendants failed to fulfill their ethical responsibilities under the NYRPC by

failing to keep the Debtors informed of the status of their case, failing to consult with the Debtors in order to make decisions about the case, and failing to promptly comply with the Debtors' repeated requests for information.  According to Mr. Ruffini, the Debtors tried multiple times to either call or meet with the Defendants, but the Defendants failed to respond.  The Defendants also failed to notify the Debtors of their state court foreclosure hearings, and the Debtors were not aware that the Defendants appeared in court on their behalf.  Trial Tr., p. 21-23.  This is in direct contrast to the duty given to lawyers under the NYRPC.

Based on the record, the Court finds that the Defendants did not provide reasonably equivalent value to the Debtors in connection with the foreclosure proceeding.  According to their own timesheets and notes, the Defendants did not provide the Debtors with any services that were comparable to the supposed thousands of dollars paid.  The Court finds that this fee is presumptively excessive.  *See* N.Y. Rules of Prof. Conduct § 1.5(a) (McKinney's 2013) ("A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense. A fee is excessive when, after review of the facts, a reasonably lawyer would be left with a definite and firm conviction that the fee is excessive…").  Additionally, the Defendants failed to perform the services that were agreed to in the Second Retainer Agreement and failed to provide services compliant with even the minimum standards of ethical conduct in New York state.  *See Kinderknecht*, 470 B.R. at 171 (finding trustee's claims to disgorge pre-petition legal fees as fraudulent conveyances "invokes [an] independent review of the reasonableness of fees under the [state] Rules of Professional Conduct"); *see also DCHC Liquidating Trust v. Tuft (In re Greater Se. Cmty. Hosp. Corp., I)*, 333 B.R. 506, 532 (Bankr. D.C.Cir. 2005) (suggesting that "services…performed so poorly as to rise to the level of a breach of a professional duty" would not constitute reasonably equivalent value).  Therefore, the Court finds that the Defendants did

not provide reasonably equivalent value in exchange for the payments made to them.  As this Court has already found that the transfers were made while the Debtors were insolvent, the Plaintiff is entitled to recover any and all payments made to the Defendants pursuant to the Second Retainer Agreement.  Because the parties still dispute the exact amount of money paid to the Defendants by the Debtor, there must be an accounting to determine the exact amount paid under the Second Retainer Agreement and to whom it was paid.

**2.**     ***3rd Cause of Action – Preference***

The Plaintiff also seeks to recover payments made to the Defendants during the one year preceding the Petition Date as preferential transfers under § 547(b).  Section 547(b) states:

> (b)Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

While the Plaintiff argues that the Defendants were "insiders" of the Debtors and thus transfers made within one year of the Petition Date are recoverable under 11 U.S.C. § 547(b)(4), the Court finds it unnecessary to conduct any preference analysis, as it has already ruled that the Defendants will have to disgorge all but $3,300 of the fees paid to them under a fraudulent

21

conveyance theory.   As no part of the $3,300 was paid during the ninety day, or one year preference period, as the Plaintiff argues, §547 does not provide a separate basis to recover any additional funds.   Therefore, the Plaintiff's preference action is moot.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff may avoid and recover, as constructive fraudulent conveyances, any payments made by the Debtors to the Defendants in connection with the loan modification/loss mitigation process in excess of $3,300.   The Plaintiffs shall also recover any payments for legal services provided in connection with mortgage foreclosure proceedings.   Additionally, the Court finds that the Plaintiff's preference claims are moot.

The Court will defer issuing a judgment until the accounting is complete.   Although the complaint seeks to seek to hold the Defendants jointly and severally liable for the full amount of any judgment entered in this case, and although this Decision did not fully recognize the distinctions among the Defendants, the Court is mindful of the distinctions between the corporate defendants, and between the corporations and the individual defendant.   Any accounting must address the specific Defendants to which or whom payments were made and any judgment will distinguish among the Defendants, unless the Plaintiff can show why the Defendants should be held jointly and severally liable.

Dated: Central Islip, New York
       February 25, 2014

                                             */s/ Robert E. Grossman*_____
                                             Hon. Robert E. Grossman
                                             United States Bankruptcy Judge